IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2010

## STATE OF TENNESSEE v. BILLY EARL MCILLWAIN, JR.

**Appeal from the Circuit Court for Gibson County**
**No. 17837     Clayburn Peeples, Judge**

_____

**No. W2009-00987-CCA-R3-CD  - Filed September 8, 2010**

_____

The Defendant, Billy Earl McIllwain, Jr., was convicted by a Gibson County jury of one count of first degree murder, two counts of aggravated assault, and one count of possession of a deadly weapon with the intent to employ it in the commission of an offense. He received an effective sentence of life imprisonment plus six years. In this direct appeal, the Defendant's only challenge is to the sufficiency of the convicting evidence. After a review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

J. Colin Morris, Jackson, Tennessee, for the appellant, Billy Earl McIllwain, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Garry Brown, District Attorney General; and Stephanie J. Hale, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**
    This case arises out of the June 3, 2007 shooting death of the victim, Jodie Alford, mother of the Defendant's child. During the June 3 shooting incident, the Defendant also pointed his weapon at Celia Kilburn and Mike Harris. Based on these actions, a Gibson County grand jury returned a four-count indictment against the Defendant, charging him with one count of first degree murder, two counts of aggravated assault, and one count of possession of a deadly weapon with the intent to employ it in the commission of an offense.

See Tenn. Code Ann. §§ 39-13-202 (first degree murder), -13-102 (aggravated assault), -17-1307 (unlawful carrying or possession of a weapon).

The Defendant and the victim had a tumultuous romantic relationship and were involved in an ongoing custody battle. After an argument on the morning of June 3, 2007, the victim left the Defendant's residence in Jackson with the child. She went to her father's house in Dyer.

Brandon Browning testified that he had known the Defendant for about ten years. He kept a black book bag for the Defendant, containing the Defendant's guns, because the Defendant, as a convicted felon, was not allowed to have them in his possession. On the morning of June 3, around 11:15 a.m., the Defendant called Mr. Browning requesting his bag. According to Mr. Browning, the Defendant sounded normal. Mr. Browning left the bag outside for the Defendant, which the Defendant picked up on his way to Dyer.

Celia Kilburn, the victim's aunt, testified that she lived at 246 Linden Street in Dyer and that her brother, Tommy Alford, also lived on Linden Street. Tommy Alford was the victim's father. On the morning of June 3, 2007, the victim and her son were staying with her father on Linden Street. When Mrs. Kilburn returned home that morning from church, she spoke with the victim by telephone, ate lunch, and then walked to her brother's house about 12:45 p.m. Mrs. Kilburn saw the Defendant's truck parked in the yard as she walked toward the house. After stepping onto the porch, she heard a "loud racket" coming from inside the house, so she opened the front door. Mrs. Kilburn was met by the Defendant, who pointed a handgun at her. The Defendant then turned and fired at the victim, who was sitting on the floor up against the couch. Mrs. Kilburn ran from the house screaming, alerting the neighbors, including Mike Harris. According to Mrs. Kilburn, when the Defendant pointed the gun at her, she froze and was "waiting to die."

Mike Harris, a paramedic, testified that he lived near Tommy Alford's house. On June 3, 2007, he was sitting on his front porch, when he heard a "loud bang" and then someone screaming. He went to investigate and saw Mrs. Kilburn running down the street toward her house. He asked Mrs. Kilburn what was wrong, and she stated that "he shot her" and pointed toward Tommy Alford's house. Mr. Harris started toward the residence and, just before he got to the driveway, he saw the Defendant exit the house. When the Defendant saw Mr. Harris, he pointed the handgun at Mr. Harris, who immediately stopped and started "backing up." The Defendant then lowered his gun, got into his truck, and drove away. According to Mr. Harris, the Defendant was very "casual" as he left the house. Mr. Harris felt "threatened" when the Defendant pointed the gun at him, and he worried for the safety of his nearby wife and child.

After the Defendant left, Mr. Harris went inside the house and started rendering first aid to the victim, who was lying on the floor with a gunshot wound to her chest. According to Mr. Harris, the victim was still making voice responses when he entered. Prior to emergency personnel arriving on the scene, the victim lost consciousness, and Mr. Harris attempted CPR. Mr. Harris did not observe "any signs of life" as the victim was loaded onto the ambulance.

Officer Ryan Shanklin, at the time of the shooting employed with the Kenton Police Department, was informed about the shooting and given a description of the Defendant's truck. While patrolling, Officer Shanklin saw a vehicle matching the description. The vehicle was parked in a driveway, and the driver, later identified as the Defendant, was waving his arm out of the driver's side window to get Officer's Shanklin attention. Officer Shanklin stopped, asked the Defendant to exit the vehicle, and placed him in handcuffs. According to Officer Shanklin, the Defendant, who did not appear to be intoxicated, was crying and stated, "I know I fucked up" and "You don't know what she's put me through with my kids." The Defendant was then turned over to Dyer City police officers. The Defendant was unarmed at the time he was detained, and no weapon was found inside the truck.

The Defendant was transferred to the Dyer City Police Department. After arriving at the station, Assistant Chief of the Dyer Police Department Brad Oliver read the Defendant his Miranda rights. The Defendant signed a waiver of rights form at 2:13 p.m. and, thereafter, gave a statement wherein he admitted to shooting the victim. Sergeant Rodney Wilkins also witnessed the statement, and the Defendant appeared "normal" to him, showing no signs of intoxication. Also, according to Asst. Chief Oliver, the Defendant was upset during the interview, but he did not exhibit any signs of intoxication.

A black book bag containing 9 mm rounds had been found abandoned just outside the city limits of Dyer. Forensics determined that these rounds were the same brand and caliber as the ones used to shoot the victim. The shot that killed the victim was fired somewhere between six inches and two feet from the skin. The victim's blood was found on the Defendant's shorts. Moreover, according to the victim's mother, the Defendant had previously threatened to kill her and the victim.

The Defendant testified on his behalf claiming that he was intoxicated at the time of the shooting, that he did not intend to go to the residence to kill the victim, and that the shooting was accidental. The Defendant's mother testified about the Defendant's level of intoxication on the morning of June 3. According to her, the Defendant had been drinking and admitted to taking a "handful" of pills just prior to the shooting.

Following the conclusion of the proof, the jury found the Defendant guilty as charged. He received an effective sentence of life imprisonment plus six years. He now appeals.

**Analysis**

The Defendant challenges the sufficiency of the convicting evidence.[1] Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

First degree premeditated murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). To be premeditated, the intent to kill must have been formed before the act itself, and the accused must be sufficiently free from excitement and passion. Tenn. Code Ann. § 39-13-202(d). An intentional act requires that the person have the desire to engage in the conduct. Tenn. Code Ann. § 39-11-106(a)(18). Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding

---

[1] He does not challenge his weapon possession conviction on appeal.

-4-

the offense. <u>Bland</u>, 958 S.W.2d at 660; <u>State v. Anderson</u>, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Our supreme court has noted the following non-exclusive factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. <u>Bland</u>, 958 S.W.2d at 660.

As relevant here, a person commits aggravated assault when he or she intentionally or knowingly commits an assault as defined in Tennessee Code Annotated section 39-13-101 and uses or displays a deadly weapon. <u>See</u> Tenn. Code Ann. § 39-13-102(a)(1)(B). A person commits an assault if he or she "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2).

The Defendant submits that the shooting was accidental, stating that, if Mrs. Kilburn "had not abruptly entered the room[,] the killing . . . would have not taken place." As for the counts of aggravated assault, the Defendant contends that the State did not prove all elements of the offense because he pointed the gun at Mrs. Kilburn and Mr. Harris for only short periods of time.

The evidence, in the light most favorable to the State, proved that the Defendant and the victim were involved in a troubled romantic relationship and fought constantly about the custody of their child. After an argument on the morning of June 3, the victim left and went to her father's house in Dyer. The Defendant then called Brandon Browning requesting his guns, which Mr. Browning kept at his house. According to Browning, the Defendant sounded normal. The Defendant picked up his guns on the way to Dyer to see the victim. He arrived at the house, parked in the front yard, and went inside. As Mrs. Kilburn approached the house, she heard a "loud racket" and proceeded inside. Upon entering the house, the Defendant pointed his weapon at her, and she froze. According to Mrs. Kilburn she felt like she was "waiting to die." However, the Defendant then turned and shot the unarmed victim, who was sitting on the floor in front of the couch. Mrs. Kilburn left the residence screaming, and she encountered Mike Harris in the street. She told him that a shooting occurred inside her brother's house. Mr. Harris proceeded to the residence, where he encountered the Defendant, who was "casually" coming out of the residence. The Defendant pointed his weapon at Mr. Harris, who felt "threatened" and feared for his family's safety. The Defendant then left. As the victim was loaded onto the ambulance, she showed no "signs of life." The Defendant gave a statement to police confessing to shooting the victim, and the victim's mother testified that, on a prior occasion, the Defendant had threatened to kill her and the victim.

The jury heard the Defendant's testimony that he was intoxicated and that he did not intend to shoot the victim. The jury was also aware of the time frames surrounding the Defendant pointing his weapon at Mrs. Kilburn and Mr. Harris. By its verdict, the jury obviously found the testimony of the State's witnesses credible and rejected the Defendant's version of the events, as was its prerogative. We conclude that a rational trier of fact could find beyond a reasonable doubt that Defendant was guilty of the crimes of first degree murder and aggravated assault. The Defendant is not entitled to relief on this issue.

## Conclusion

In consideration of the foregoing, we conclude that the evidence was sufficient to support the Defendant's convictions beyond a reasonable doubt. The judgments are affirmed.

_____
DAVID H. WELLES, JUDGE